**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| S. SHANE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18cv914 |
| | ) | |
| NORTH CAROLINA DEPARTMENT OF | ) | |
| PUBLIC SAFETY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion for Summary Judgment" (Docket Entry 61) (the "First Motion") and the "Supplemental Motion for Summary Judgment" (Docket Entry 84) (the "Second Motion," and collectively, the "Motions") filed by Michael Roach ("Roach") and Mark Moore ("Moore," and together with Roach, the "Defendants"). For the reasons that follow, the Court should deny the Motions.

**BACKGROUND**

Alleging violation of his constitutional and statutory rights during his incarceration at Dan River Work Farm ("Dan River"), S. Shane Smith (the "Plaintiff") sued various North Carolina Department of Public Safety (the "NC DPS" or "NCDPS") employees. (See Docket Entry 2 (the "Complaint") at 1-43.)[1] Among other

_____

1 Citations herein to Docket Entry pages utilize the CM/ECF
(continued...)

claims, the Complaint alleges that Roach retaliated "against Plaintiff for filing grievances and court cases by removing his access to a computer, restricting his access to a word processor, and changing the type of his pants" and that Moore "participat[ed] in the retaliation by changing the type of Plaintiff's pants." (Docket Entry 8 (the "Recommendation") at 17.) The Complaint also asserts a claim against Roach under the Americans with Disabilities Act of 1990 (the "ADA") and Section 504 of the Rehabilitation Act (the "Rehabilitation Act"), wherein Plaintiff alleges that Roach removed Plaintiff from his prison job due to Roach's disapproval of Plaintiff's footwear, a situation ultimately resolved only by Plaintiff's purchase of new footwear. (See id. at 3-4.) Because "the Complaint d[id] not allege that the footwear that Roach required Plaintiff to use on the job differed from that used by non-disabled prisoners or that [the NC DPS d]efendants provided the required footwear for free to non-disabled prisoners to work in the kitchen," the Recommendation concluded that "the Complaint fail[ed] to allege facts showing that [the NC DPS d]efendants treated Plaintiff differently than his nondisabled counterparts resulting in his exclusion from the kitchen job." (Id. at 5-6.)

Due to this and other failings, the Recommendation advised the Court to dismiss all of Plaintiff's claims except the retaliation

---

1(...continued)
footer's pagination.

claims against Roach and Moore. (See id. at 2, 16-17.) Plaintiff objected to the Recommendation. (See Docket Entry 13 (the "Objections").) As relevant here, the Objections assert:

> [Various other NC DPS defendants], Roach[,] and Moore did not permit Plaintiff to participate in the Inmate Job Assignment Program alleging the footwear long-provided to him by prison officials was not acceptable.
>
> Participation in the Inmate Job Assignment Program permits inmates to earn valuable sentence reduction credits, and provides a meager weekly Incentive wage between 40¢ to $1.25 per day. Plaintiff was being denied participation in the program because of his disability — he required special footwear.
>
> In addition to missing fingers, Plaintiff also has no toes; therefore, he requires footwear which accommodates his unique disability. Non-disabled prisoners participating in the Inmate Job Assignment Program are provided footwear at no cost to them. Plaintiff, in order to participate in the Inmate Job Assignment Program, was required to purchase footwear at his own expense. The [d]efendants refused to purchase footwear which would accommodate his disability needs.

(Id. at 3 (citations omitted).)

In light of Plaintiff's allegation that prison officials provided appropriate footwear at no cost to non-disabled participants in the Inmate Job Assignment Program (but not to him), the Court (per Chief United States District Judge Thomas D. Schroeder) allowed Plaintiff to pursue his claims for compensatory damages under the ADA and Rehabilitation Act against Roach in his official capacity as an employee of the NC DPS. (See Docket Entry 14 at 3-7, 10-11; Text Recommendation dated Oct. 17, 2019; Docket Entry 16 at 1-2.) The Court also permitted Plaintiff's claims

3

against "Roach for retaliating against Plaintiff for filing grievances and court cases by removing his access to a computer, restricting his access to a word processor, and changing the type of his pants and against [d]efendant Moore for his participation in the retaliation by changing the type of Plaintiff's pants" to proceed, but dismissed Plaintiff's remaining claims. (Docket Entry 14 at 10.) Plaintiff subsequently filed an amended complaint (see Docket Entry 26 (the "Amended Complaint")),[2] attempting to raise an additional claim (see Docket Entry 24 at 2 (explaining that Amended Complaint contains "the original paragraphs 1-113[] and the amended paragraphs, which are numbered as 114-123")) that failed to survive review under 28 U.S.C. § 1915A (see Text Order and Recommendation dated Mar. 24, 2020; Docket Entry 37 at 4).

Following the filing of the Amended Complaint, the parties engaged in discovery. (See Text Order dated Mar. 24, 2020 (establishing discovery deadline of Oct. 26, 2020).) In July 2020, Plaintiff moved to compel responses to "Plaintiff's First Request For Production of Documents" (Docket Entry 34 at 6) and "Plaintiff's First Request for Admissions to Defendants" (id. at 10), which Plaintiff served on Defendants' counsel on April 16, 2020, but to which Defendants failed to respond (id. at 1). (See,

_____

2 Plaintiff verified the Amended Complaint under penalty of perjury. (Docket Entry 26 at 18.)

4

e.g., Docket Entry 33 at 1-2.)[3]  The Court (per the undersigned) granted that request in part, ordering "that, on or before 09/04/2020, Defendants shall respond without objection (other than assertions of privilege) and shall produce any nonprivileged documents responsive to [certain specified] Requests." (Text Order dated Aug. 14, 2020 (the "First Production Order").)  However,

> the Court decline[d] to enter any order as to Plaintiff's First Request for Admissions to Defendants because Federal Rule of Civil Procedure 36(a)(3) provides a self-operating consequence for failures to respond to such requests.  The Court likewise [did] not require any response to the document requests Plaintiff appended to his requests for admission, because all of those requests only sought production related to denials of Plaintiff's requests for admission and Defendants evidently served no such denials.

(Text Order dated Aug. 14, 2020 (parentheticals omitted).)

Defendants failed to comply with the First Production Order. (See Docket Entry 44 at 2-3.)  Accordingly, the Court ordered "Defendants to respond without objection (other than assertions of privilege) and to produce any nonprivileged documents responsive to [the specified] Requests . . . on or before 10/27/2020, and to pay Plaintiff's reasonable expenses incurred due to Defendants' non-compliance with the Text Order dated 08/14/2020." (Text Order dated Oct. 13, 2020 (the "Second Production Order").)  A dispute arose regarding Defendants' compliance with the Second Production

---

3 Defendants likewise failed to respond to Plaintiff's motion to compel.  (See Docket Entries dated July 8, 2020, to Aug. 14, 2020.)

5

Order (see Text Recommendation dated Feb. 19, 2021), prompting Defendants to provide a belated supplemental production of "responsive medical records" (Docket Entry 53, ¶ 16; see id., ¶¶ 5-8), which the Court (per Chief Judge Schroeder) thereafter ordered Defendants to re-serve on Plaintiff "in a manner that documents Plaintiff's receipt" (Docket Entry 86 at 1).

In the interim, on November 25, 2020, Defendants filed the First Motion, which addresses only Plaintiff's ADA and Rehabilitation Act claims against Roach. (See Docket Entries 62-66.) Plaintiff opposed the First Motion (see Docket Entries 75 to 77-1), averring in part as he did so that Defendants failed to produce documents, including but not limited to medical records, as the First Production Order and Second Production Order directed (see Docket Entry 75-1, ¶¶ 14-32). Plaintiff urged the Court to deny summary judgment on this basis alone (see Docket Entry 75 at 7), but also opposed the First Motion on its merits (see generally Docket Entries 75 to 77-1). Plaintiff further disputed Defendants' contention that "Plaintiff's remaining allegations primarily center on alleged failure to provide accommodations regarding work footwear" (Docket Entry 75 at 5-6 (citing Docket Entry 64, ¶ 3) (emphasis omitted)), noting that the Court also permitted Plaintiff to proceed on his retaliation claims against Defendants (see id. at 6), and arguing that Defendants' failure to address his retaliation claims waived any arguments that Defendants possessed against those

claims (see Docket Entry 75-1, ¶¶ 4-5). Defendants did not file a reply in support of the First Motion. (See Docket Entries dated Jan. 11, 2021, to present.)

On February 17, 2021, however, Defendants sought permission to file an amended summary judgment motion, as "[i]n drafting the[ First Motion], Defendants did not address the issue of Plaintiff's clothing or typewriter access." (Docket Entry 80, ¶ 11.) The Court (per the undersigned) deemed this request moot, as, pursuant to this Court's Local Rules, "Defendants do not need leave of the Court to file a belated summary judgment motion and the Court may consider a belated summary judgment motion (although such consideration may not occur until trial)." (Text Order dated Feb. 18, 2021.) On March 16, 2021, Defendants filed the Second Motion (see Docket Entry 84), which addresses Plaintiff's claims of retaliation against "Defendants pertaining to access to a typewriter and clothing" (Docket Entry 85 at 2; see id. at 1-7). Plaintiff filed a response in opposition to the Second Motion (see Docket Entries 89-90), to which Defendants filed no reply (Docket Entries dated May 3, 2021, to present).

As relevant to the Motions,[4] the record (taken in the light most favorable to Plaintiff unless otherwise noted) reveals the following:

"Plaintiff was born with no fingers or toes, which significantly limits his ability to perform many common tasks, including walking, writing, standing, working, and grasping objects." (Docket Entry 64, ¶ 4 (citing Docket Entry 2); see also Docket Entry 75 at 6 (agreeing with assertion).) "In addition to the missing digits, [Plaintiff] also suffer[s] from extremely sensitive skin." (Docket Entry 90, ¶ 5.) The NC DPS considers Plaintiff a "Qualified Person with a Disability" under the ADA. (Docket Entry 89-2 at 2.) Plaintiff has been incarcerated in the NC DPS "since approximately 1990." (Docket Entry 90, ¶ 3.) In 2011, Plaintiff and NC DPS officials entered into a settlement agreement (see Docket Entry 85-3) (the "Settlement Agreement" or "Agreement") to resolve a lawsuit that Plaintiff brought against NC DPS officials under the ADA. (See, e.g., Docket Entry 90, ¶¶ 30-32.) Under the Settlement Agreement, NC DPS officials must provide Plaintiff, "free of charge[,] appropriate clothing and assistive devices and supplies," including at least "seven (7) zippered pants" made of "one hundred percent (100%) cotton." (Docket Entry

_____

4    In their Motions, Defendants do not address Plaintiff's retaliation claim against Moore specifically, relying exclusively on affidavits from Roach, which do not mention Moore, and a few additional documents that also do not mention Moore. (See Docket Entries 62-66, 85 to 85-3.)

8

85-3 at 2.)  Plaintiff's immediate family members can also send him tennis shoes and insulated boots.  (Id. at 4.)

In addition, "[Plaintiff] shall be allowed access to use a Brother ML 500 electric word processor(6) six days a week for a total of twenty (20) hours per week," which processor the NC DPS shall maintain in working order at its expense.  (Id. at 3.)  NC DPS shall also "maintain a comparable word processor as a backup for use during repair and maintenance of the ML 500 processor."  (Id.)  However, "if the maintenance and upkeep of the ML 500 processor becomes cost prohibitive for [the NC DPS], or if it becomes evident that the ML 500 processor is a poor accommodation choice due to unforeseen physical incompatibilities with [Plaintiff's] disability, a comparable processor may be substituted if agreed upon by both [Plaintiff] and an official ADA Coordinator."  (Id. at 4.)

As further concerns Plaintiff's physical condition(s), he avers:

Although naturally dominant, Plaintiff's "right hand is very limited" and thus his "left hand is [his] main source of function." (Docket Entry 90, ¶ 10.)  "From a cursory observance, people make the assumption that [he] ha[s] a thumb.  What [he] ha[s] is not a thumb, but the root from which a thumb would extend.  The ends of [his] hands, where one would assume the fingers would be, are in fact, the upper portions of where the wrist would begin on the hand

9

of a non-disabled person." (Id., ¶ 11.) "The appendage that is often misidentified as a thumb is [his] absolute everything," as it enables him to "feed [him]self, dress [him]self, and care for [him]self, all only if appropriately accommodated. Without this appendage[, he] would instantly become a dependent invalid." (Id., ¶ 12.)

"Where a person with ten fingers has multiple ways of performing simple tasks, [Plaintiff] ha[s] only one way [he] can do the same. Without appropriate accommodation, [his] life is a painful hurdle-filled life of constant insurmountable obstacles." (Id., ¶ 13.) "The appendage referenced above is a single bone with a hinge joint attaching it to the hand. The appendage is capable of bending to hold an object, but it is unable to grasp objects for extended periods of time without severe pain and discomfort." (Id., ¶ 14.) "[T]o the left of th[is] 'thumb' is the section of the hand where one would assume the fingers to be. In lieu of fingers, [he] ha[s] four deep crevices which are excessively sensitive and very vulnerable to irritation and even infection if not properly accommodated or cared for." (Id., ¶ 15.) Plaintiff's "ability to function is disrupted by the slightest alteration in the form of this hand. For example, if something as common as a callus should form on this hand, it negatively affects [his] ability to grasp objects, even items as simple as an eating utensil." (Id., ¶ 16.)

10

Unlike his left hand, Plaintiff's "right hand alone is useless. However, when paired with [his] left hand, it becomes indispens[a]ble." (Id., ¶ 17.) On Plaintiff's right hand,

> there is an appendage which, like the left hand, is often mistaken for a thumb. This is not a thumb, but the beginning of the base where a thumb would grow. Like the left hand, this appendage includes a single bone, but unlike the left hand, this one does not include the hinge joint; therefore, it is physically unable to securely grasp objects. Unlike the left hand, [Plaintiff] ha[s] absolutely no grip with this hand.
>
> The valley or space between the appendage and the right hand consists of a large area of very sensitive surgical scars. At times, this area becomes so sensitive that even the slightest touch is staggeringly painful.
>
> As with the left hand, [Plaintiff] ha[s] no fingers on [his] right hand. Albeit, there are three very minuscule protrusions which one could easily assume are the bases or roots of where the fingers would form. This would be the area of the three outer-most fingers. [Plaintiff is] completely absent any trace of the finger which would be located beside the thumb. As a child ([Plaintiff] was approximately seven years of age), doctors attempted an unsuccessful experimental surgery to provide grip and removed a deformed bone from that hand. The surgery was unsuccessful and [Plaintiff] remain[s] without effective grip with that hand.
>
> The three uppermost protrusions of [Plaintiff's] right hand, which could be identified as the bases for fingers are also very sensitive. These areas are often prone to splitting open if hit or bumped the wrong way. As with the left hand, [Plaintiff] do[es his] best to take very good care of [his] hands so that [he] may function. In order to function, [he] require[s] accommodation.

(Id., ¶¶ 18-21 (paragraph numbering omitted).) Additionally:

> For [Plaintiff], eating is not a simple process. [He] must think how each item will be handled. However, if appropriately accommodated, [he is] capable of feeding [him]self. Sometimes it takes [him] longer to consume

11

> [his] meal than it does a non-disabled person, and under
> Mr. Roach's direction, his officers often refused to
> allow [Plaintiff] the time [he] needed to consume [his]
> meal.
>
> To carry a meal tray, [he] would generally put the
> eating utensils in [his] pocket, and sometimes the fruit
> (if [they] have fruit for the meal), and sometimes, even
> the beverage glass (the beverage glasses are plastic 9.5
> oz. tumblers), so that [he] can carry [his] food tray.
> Prior to picking up [his] tray, [he] look[s] at the tray
> (a.k.a. plate) and its contents so that [he] will know
> where to place [his] hand under the tray so [he] can
> balance it. [His] ability to carry items relies more on
> balance than grasp or grip.

(Id., ¶¶ 27-28 (paragraph numbering omitted).) Moreover, due to
their design, certain NC DPS eating utensils Plaintiff "simply
cannot hold well enough to functionally feed [him]self." (Id.,
¶ 16.) Thus, he "ha[s] been provided with designs which [he] can
manipulate." (Id.)

Plaintiff's disability also makes dressing and undressing "an
arduous and irksome task." (Id., ¶ 34.) Accordingly, under the
Settlement Agreement, "prison officials [a]re to provide
[Plaintiff] with 'appropriate' clothing which is made of 100%
cotton." (Id., ¶ 35.) "In 2011, after the Agreement was reached,
[p]rison officials informed [Plaintiff that] they were going to be
purchasing [his] clothing items from an outside supplier (i.e.,
Walmart, JC Penney, etc.)." (Id.; see also Docket Entry 34 at 12
(admitting, per Rule 36(a)(3) of the Federal Rules of Civil
Procedure (the "Rules"), "that prior to Mr. Roach's switch of
Plaintiff's pants and clothing items, prison officials purchased

12

Plaintiff's pants and clothing items from an outside supplier").) Shortly after execution of the Settlement Agreement, NC DPS officials and Plaintiff met "and discussed each aspect of the Agreement; specifically what [Plaintiff] needed in order to be appropriately accommodated and to satisfy each portion of the Agreement." (Docket Entry 90, ¶ 38.)

"When questioned during the discussions, [Plaintiff] would explain why certain clothing items worked for [him] and why others did not. The meeting was productive and prison officials purchased clothing which accommodated [his] disability needs and was made of 100% cotton." (Id.) "When [Plaintiff's] clothing items became worn, prison officials would replace them with the same items that [NC DPS officials and Plaintiff] had agreed upon." (Id., ¶ 41.) "When prison officials initially purchased [Plaintiff's] pants (and every purchase thereafter) from the outside supplier, in addition to being 100% cotton with zippers, the pants were equipped with two front and two back pockets, and appropriate belt loops. The pants purchased met [Plaintiff's] accommodation needs." (Id., ¶ 42.)

"With [Plaintiff's] disability, [he] rel[ies] heavily on pants pockets. Without accessible pants pockets, [he is] placed at a great disadvantage. [He] simply cannot carry items in [his] hands like a person with fingers can." (Id., ¶ 43.) Additionally, to dress and undress, Plaintiff "rel[ies] on the belt loops to pull up or remove [his] pants because [he] do[es] not possess the grasp or

13

grip to pull up [his] pants otherwise." (Id., ¶ 44.) He "hook[s his] 'thumbs' in the belt loops and pull[s] up the pants. Once [he] ha[s] pulled up [his] pants, [he] hook[s his] 'thumbs' in the two front-most belt loops to pull the fly together so that [he] may fasten and zip the pants. Without the belt loops, it is very difficult and painful to dress and undress [him]self." (Id.)

Plaintiff's lack of toes also presents significant obstacles. (See, e.g., Docket Entry 75-1, ¶¶ 33-40, 46-47.) Although different sizes, Plaintiff's feet "range in the 6½-7 size range." (Id., ¶ 35.) Given the placement of his arches, however, his feet with toes "would measure in the 10½-11 size range," so Plaintiff "wear[s] a size 9." (Id.) "Proper footwear is important in [his] ability to walk, for the footwear must feel balanced or [Plaintiff] will veer into walls, trip, stumble, or fall down. Finding adequate footwear which accommodates [his] disability is difficult." (Id.) "Toes are what give one balance. Without toes, [Plaintiff's] balance is a lot mental; meaning that [he] ha[s] to be cognizant of the steps that [he] take[s], especially on uneven ground." (Id., ¶ 36.) "[Plaintiff is] generally fine on level, even surfaces, as long as [he] keep[s] watch for obstacles. Even a slight dip can cause [him] to stumble or stagger, but if [he is] aware of the dip, [he] can anticipate it and adjust accordingly." (Id.) "A lot of [Plaintiff's] walking and balance depends on [his] footwear. Like tires on a car, [Plaintiff's] footwear has to

14

provide a proper balance. [He] walk[s] better in lightweight, balanced footwear." (Id., ¶ 37.)

"The ends of [Plaintiff's] feet where the toes should be are probably the most painfully sensitive area of [his] body. The areas where the big toes should be constantly ache and throb. The slightest touch can literally drop [him] to [his] knees." (Id., ¶ 38.) Accordingly, he "select[s] footwear that protects, but does not interfere with[,] this particular area of [his] feet. Steel-toed shoes cause [him] to suffer intense pain and discomfort." (Id.) For normal feet with toes, "the toes rest under the steel-toed cup" of such shoes, "and the toe joints bend with the boot, thus the steel-toe (or composite-toe) does not push into the foot." (Id., ¶ 46.) However, Plaintiff's "foot in [a] steel-toed or composite-toed boot does not bend" due to the absence of a "toe joint. The [steel] cup digs into the foot. Further, the cup causes extreme pain and discomfort where [Plaintiff's] toes and toe joint should be." (Id., ¶ 47.) As such, Plaintiff possessed a "long-standing exemption . . . regarding not wearing steel-toed boots for prison job assignments." (Id., ¶ 48; see also id., ¶ 54 ("Roach was, and remains, the only prison official to refuse to provide [Plaintiff] some form of accommodation or waiver regarding [his] footwear for a prison job assignment.").)

In February 2016, NC DPS officials promoted Plaintiff from medium custody to minimum custody, resulting in Plaintiff's

transfer from the Warren Correctional Institution ("Warren C.I.") to Dan River. (See Docket Entry 26, ¶¶ 10-11; Docket Entry 90, ¶¶ 45, 51.)[5] "Prisoners designated as medium custody wear variations of brown uniforms, and those designated as minimum custody wear variations of green uniforms." (Docket Entry 90, ¶ 47.) Due to Plaintiff's "custody promotion, prison officials had to purchase different color clothing for [him] which met the terms of the Agreement. The prison official procuring the pants for [Plaintiff] specifically asked [him] what [he] needed accommodation-wise. [Plaintiff] explained what [he] needed, and the green pants prison officials purchased for [him] met all of [his] accommodation needs." (Id., ¶ 50.)

Once Warren C.I. officials received "the newly purchased green pants," Plaintiff "was transferred to the minimum custody Dan River" (id., ¶ 51), where Defendants worked (see, e.g., id., ¶¶ 52, 152-56).[6] By September 2016, Plaintiff transferred from Warren

_____

5 "Medium custody is more secure and restrictive than minimum custody. Minimum custody prisoners are those deemed more behaved and obedient and have demonstrated the ability to follow and abide by the laws of North Carolina and the rules of prison. [Plaintiff] was and [remains] quite proud of [his] advancement to minimum custody." (Docket Entry 90, ¶ 46.)

6 A dispute exists regarding Roach's position during Plaintiff's incarceration at Dan River. In his affidavits, Roach maintains that, "[a]t the time of the events enumerated in Plaintiff's Complaint, [Roach] was employed as a Warden II at Dan River." (Docket Entry 62-1, ¶ 3; Docket Entry 85-2, ¶ 3.) Plaintiff responds that "Roach was at all times during [Plaintiff's] confinement at Dan River the Assistant Superintendent (continued...)

16

C.I. to Dan River. (Compare Docket Entry 62-1, ¶ 7 (indicating, in Roach affidavit, that Plaintiff transferred to Dan River in September 2016), with, e.g., Docket Entry 90, ¶ 52 (averring that Plaintiff "was housed at Dan River from August 22, 2016 through October 30, 2018"), and Docket Entry 77-1 at 2 (reflecting Plaintiff's transfer to Dan River in August 2016).) Shortly after Plaintiff's arrival at Dan River, he informed its ADA Coordinator, Amanda Cobb (see Docket Entry 90, ¶ 54),[7] that officials at Warren C.I. had "not purchase[d] enough pants to satisfy the terms of the Agreement. Ms. Cobb directed that four more pairs of green pants be purchased for [Plaintiff] to satisfy the Agreement. The pants Ms. Cobb directed be purchased accommodated [Plaintiff's] disability and met [his] needs. The pants were purchased and issued to [Plaintiff]." (Id., ¶ 55.)

---

6(...continued)
for Custody & Operations. At no time during [Plaintiff's] confinement at Dan River was Mr. Roach the facility's Warden." (Docket Entry 90, ¶ 52; see also Docket Entry 75-1, ¶ 59 ("At the time of the events enumerated in [Plaintiff's] Complaint, Mr. Roach was NOT the Warden; he was the assistant superintendent for custody." (emphasis in original).) Contemporaneous evidence in the record identifies Roach as an "Assistant Superintendent of Custody and Operations" (Docket Entry 89-6 at 2; see also Docket Entry 76-7 at 2 ("Assistant Superintendent")) and a "Correctional Asst. Superintendent II" (Docket Entry 89-7 at 2), rather than a "Warden," during Plaintiff's incarceration at Dan River. To the extent any discrepancy exists between a "Warden II" and "Assistant Superintendent," it does not affect resolution of the Motions.

7 "Upon [Plaintiff's] arrival at Dan River, Timothy Willis served as Warden." (Id., ¶ 53.) Upon his retirement, Cobb became Warden. (See id., ¶ 54.)

"Under North Carolina law, prisoners may earn sentence reduction credits for participation in work and program activities, and performing acts of exemplary conduct, or working under extraordinary conditions." (Docket Entry 26, ¶ 17.) "Plaintiff is serving a life sentence and is currently eligible for parole November 14, 2020." (Id., ¶ 84.) Sentence reduction credits earned through prison jobs reduce Plaintiff's parole eligibility date. (See id., ¶ 18.) In addition, only through participation in the prison job program could Plaintiff earn incentive wages (see Docket Entry 75-1, ¶ 70) and "comply with the case management plan set out by [his] correctional case manager at Dan River." (Id., ¶ 71.) In that regard:

> A prisoner's case management plan is set by his correctional case manager. Compliance with the plan aids a prisoner in custody level promotions, parole, and participation in the Mutual Agreement Parole Program (MAPP). [Plaintiff] was sentenced under North Carolina's Fair Sentencing Act. [His] only path to freedom is through a MAPP.

(Id., ¶ 72.)

"Upon Plaintiff's arrival at Dan River, he requested a job assignment as chaplain's clerk, school clerk, canteen clerk, and canteen warehouse clerk, but was denied each of those requests." (Docket Entry 26, ¶ 12.) "In approximately September 2016, Plaintiff was assigned as the inventory stock clerk for the facility's kitchen. In this position, Plaintiff was responsible for maintaining a food, supply, and equipment inventory with an

18

approximate value of $75,000.00. Despite his disability, Plaintiff is a proficient clerk." (Id., ¶ 13.)

Shortly after Plaintiff's arrival at Dan River, "Roach made it abundantly clear to [Plaintiff] that he did not like the terms of the Agreement and he was going to limit its scope." (Docket Entry 90, ¶ 56.) More particularly, "Roach specifically told [Plaintiff] that he did not like the terms of the 2011 Settlement Agreement and he was going to do everything he could to take as much of it as he could away from [Plaintiff]." (Docket Entry 75-1, ¶ 65.) "In approximately October 2016, Mr. Roach removed Plaintiff from his assignment because he (Mr. Roach) did not approve of the footwear prison officials had been providing to accommodate Plaintiff's disability." (Docket Entry 26, ¶ 14; see also Docket Entry 34 at 10 (admitting, via Rule 36(a)(3), "that Plaintiff was not permitted to participate in the Inmate Job Assignment Program while housed at the Dan River Work Farm because Mr. Roach did not approve of the footwear Plaintiff wore to accommodate his disability").)[8]

According to Roach:

Plaintiff began his kitchen inventory clerk "position wearing shoes that were not approved and/or up to safety standards for the

_____

    8   The record contains a Dan River medical report for Plaintiff requesting, on September 20, 2016, an "[e]valuation for proper and safety fitting boots for job, due to congenital deformities. All jobs require steel toe boots." (Docket Entry 76-2 at 3.) The report reflects entry of that request on September 27, 2016, and its authorization as of October 5, 2016. (Id.)

kitchen area." (Docket Entry 62-1, ¶ 10.) "These safety standards are in place to protect the safety of offenders in their work duties, as well as to limit liability on the part of the facility." (Id., ¶ 11.) "Due to the lack of approved footwear, Plaintiff was not allowed to work in the kitchen area of the facility." (Id., ¶ 12.) "Plaintiff was subsequently taken to a medical professional to be fitted for a custom made pair of shoes that accommodated his disability, while adhering to safety standards." (Id., ¶ 13.) "These custom orthotics/footwear were provided to Plaintiff at no expense to himself." (Id., ¶ 14.) "Subsequent to receiving the custom footwear, Plaintiff informed the facility that the custom footwear was not comfortable." (Id., ¶ 15.) "Plaintiff subsequently acquired new footwear from outside the facility that were not paid for by [NC] DPS." (Id., ¶ 16.)

"The only reason Plaintiff was not permitted to work in the kitchen area was due to his initial footwear failing to meet safety standards." (Id., ¶ 17.) "[Roach] as well as other individuals within the facility accommodated Plaintiff's disability in a way that would allow him to work safely." (Id., ¶ 18.) "[Roach] den[ies] that [he] nor [sic] any other named Defendants have ever knowingly or willfully acted in any manner intended to deprive [Plaintiff] of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States." (Id., ¶ 19.)

20

Plaintiff disputes these assertions. (See, e.g., Docket Entry 75-1, ¶¶ 41-57.) To begin, Plaintiff "disagree[s] that [his] footwear was not approved for kitchen use, for [his] footwear was purchased by prison officials who outranked Mr. Roach so that [he] could work the exact same position in another prison facility." (Id., ¶ 61.) According to Plaintiff, "Roach just did not like that [Plaintiff's] footwear was provide[d] to [him] by prison officials through a federal civil rights settlement which was brought under the [ADA] and the Vocational Rehabilitation Act." (Id.) Further, Plaintiff contends that Roach did not have "[him] fitted for 'custom made' boots" but rather "a standard, over-the-counter boot." (Id., ¶ 41.) "Roach insisted that [Plaintiff] be fitted for steel-toed boots. He would not permit any other consideration or accommodation." (Id., ¶ 42 (emphasis in original).) "[Plaintiff] was referred to the Hanger Clinic (the contracted footwear provider to the NCDPS) for footwear. [Plaintiff] explained to them what [he] needed. The examiner did not understand why the facility was insistent that [Plaintiff] be fitted for steel-toed shoes with the absence of toes, but, as the examiner stated, they were being paid by the NCDPS, and the NCDPS order stated [that Plaintiff] was to be fitted for steel-toed boots." (Id., ¶ 43.)

Furthermore, a "Clinical Summary" from the Hanger Clinic (dated October 27, 2016) reflects a "New Eval" of Plaintiff for

"Non Therapeutic Shoes," specifically "steel toed boots" (Docket
Entry 76-2 at 2 (emphasis in original)), in connection with which
"[m]easurements and impressions [were] taken for custom inserts,
with reinforced medial arch support, increased heel cushion to
reduce repetitive loading stress/pain, and no toe filler (per
patient request)" (id. at 4).  The Clinical Summary requests
authorization for "codes L3222 x 2 (Men's Hightop Shoe) and L3010
x2 (Custom Molded longitudinal Arch Support)" and asks the NC DPS
to "call Hanger . . . when approved," noting that "[i]tems will be
ordered at that time."  (Id.)  The summary judgment materials do
not contain further information regarding that authorization.

However, on November 11, 2016, Plaintiff submitted an "Inmate
Reasonable Accommodation Request Form," which explains that
Plaintiff is "unable to wear steel-toed shoes/boots.  Not only are
they difficult for [Plaintiff] to walk in, they are very painful
and cause a great amount of discomfort."  (Docket Entry 76-6 (the
"ADA Request Form") at 2 (parenthetical omitted).)  As to the
"Accommodation Requested," the ADA Request Form states:

> For NCDPS to continue with the long-standing
> accommodation.  For all of [Plaintiff's] incarceration,
> [he] ha[s] been provided a waiver for steel-toed shoes.
> In lieu, prison officials have always purchased a
> non-steel-toed shoe/boot for [Plaintiff] to wear while on
> any assigned prison job.  [Plaintiff] arrived at [Dan
> River] with 2 pair[s] of boots and 1 pair of shoes which
> were purchased by prison officials for any job
> assignments [that Plaintiff] may have.

22

(Id. (emphasis in original).) In December 2016, NC DPS officials responded that the "ADA request for non-steel toed boots can be resolved through regular sick call procedures," a response provided to Plaintiff on January 4, 2017. (Id. at 3.) However, "Roach would not approve for Plaintiff to be provided any footwear which was not steel toed." (Docket Entry 34 at 11.)

Plaintiff also contacted Ralph Baker of Ralph Baker's Shoes in Salisbury, North Carolina, from whom NC DPS officials purchased Plaintiff's footwear following the Settlement Agreement and prior to Plaintiff's transfer to Dan River. (Docket Entry 75-1, ¶ 44.) As relevant here, on February 1, 2017, Baker responded: "I don't have an easy answer for your complex situation. Obviously, you don't need steel toes to protect toes that don't exist, but you've tried fighting that battle and can't win." (Docket Entry 76-4 at 2.)

Dated February 10, 2017, a "Hanger Clinic Non-Therapeutic Foot/Insert Eval/Fit/Delivery Form" also appears in the record. (Docket Entry 76-3 at 2.) It reflects Plaintiff's evaluation for size 10W steel toe boots with "Prefab thick cushion" inserts. (Id.) The form does not identify either the boots or the insert as customized in any regard. (See id. (not, inter alia, selecting "Custom fit" or "Custom fabricated" or providing any "Rationale for custom design").) On March 16, 2017, the Hanger Clinic provided steel-toed Dr. Comfort "Protector" boots with a "foam top cover

23

with gel/urethane base" arch supports to Plaintiff. (Docket Entry 66 at 1-3.)

A Dan River medical report dated March 27, 2017, states: "[Plaintiff] reports[ that] the work boots received from Hanger Clinic hurt his feet along the distal end where the hallux would be. He did not attempt to try to wear them to work. U[rgent ]R[equest] entered to return to Hanger to be re-evaluated per Mr. Roach Assistant Superintendent." (Docket Entry 76-7 at 2.) The report offers as the "Reason for Request" that Plaintiff "needs to be re-evaluated with his work boots. He reports the steel toe boots rub and cause discomfort where the distal end of your hallux would be. He has congenital deformity with no toes." (Id. (emphasis omitted).) The summary judgment materials do not indicate the outcome of that request, although a letter dated April 24, 2017, from the Hanger Clinic to Deborah J. Jennings ("Jennings"), apparently an NC DPS employee (see, e.g., Docket Entry 76-2 at 3 (reflecting her involvement in generating NC DPS medical report)), reflects that Jennings requested information on the safety specifications of the boots and the material composition of the boots and arch supports "provided to [Plaintiff] . . . on March 16th, 2017." (Docket Entry 66 at 1.)

The record also contains a "Medical Treatment Refusal" form dated May 8, 2017. (Id. at 4.) The form indicates that Plaintiff "received Dr. Comfort steel toed boots size 10 W from Hanger

24

Clinic, to perform job at facility.  He refuses to wear, stating that his left foot feels pressure at distal end where toes would be.  He has on a pair of composite toe boots size 9 that were sent from family with prefabricated arch supports that came out of the Dr. Comfort boots from [the Hanger Clinic]."  (<u>Id.</u>)  It describes the recommended treatment as "[s]ize 10 W Dr. Comfort steel toe boots with prefabricated arch supports were recommended by Orthotics at Hanger Clinic on 3/16/17."  (<u>Id.</u>)  It further identifies the "possible consequences and/or complications [that] may result because of [the] refusal to accept treatment" as follows:  "The pair from Orthotics are properly fitted with correct size.  He may have friction to skin causing abrasions with smaller size boots not properly fitted."  (<u>Id.</u>)

Plaintiff notes that he "purchased, at his expense, [this alternate] pair of boots so that he could return to work, so that he could again earn [an] incentive wage and sentence reduction credits."  (Docket Entry 26, ¶ 16.)  NC DPS officials apparently permitted Plaintiff to return to his prison job with these non-prison-provided boots.  (<u>See, e.g.</u>, <u>id.</u>, ¶¶ 15-26; <u>see also</u> Docket Entry 34 at 11 (admitting, via Rule 36(a)(3), "that Plaintiff was permitted to return to a prison job assignment only after he purchased footwear at his expense which Mr. Roach required").)  However, "non-disabled prisoners are provided footwear for

25

participation in the Inmate Job Assignment Program at no cost to the prisoner." (Docket Entry 34 at 11.)

In addition, prior to Plaintiff's transfer to Dan River and in accord with the Settlement Agreement, NC DPS officials, including an ADA coordinator, and Plaintiff agreed to retire the Brother ML-500 word processor in favor of a stand-alone, non-networked desktop computer and printer for Plaintiff's written communications. (See Docket Entry 90, ¶¶ 110-12.) Due to its obsolescence, repair of the word processor had become increasingly problematic, and Plaintiff's disability rendered the processor "cumbersome and difficult for [Plaintiff] to physically operate" because "[i]t required extensive physical dexterity to adjust [his] arms and hands to type" on it (id., ¶ 109). (See id., ¶¶ 107-11.) "The change from the word processor to the computer and printer worked much better for [Plaintiff]. The computer keyboard was easier to use, and the paper was much easier to feed into the computer's printer than it was to load in the word processor." (Id., ¶ 114.) "The use of computers is widely embraced by the NCDPS. There are hundreds of prisoners within the NCDPS utilizing computers on a daily basis. The computer [Plaintiff] was to use to meet the terms of the Agreement was the same computer and printer [he] used as part of [his] job assignment." (Id., ¶ 115.)

Upon Plaintiff's transfer to Dan River, the Warden, Timothy Willis (see id., ¶ 53), "instructed the facility's computer

26

technician, Mr. Freeman, to provide [Plaintiff] access to the non-networked, standalone desktop computer and printer used by the facility's inmate chaplain's clerk.  This computer was located in the Chaplain's Office, which was directly beside and in direct view from the dormitory officer's booth."  (Id., ¶ 117.)  "Under Mr. Willis's direction, Mr. Roach provided a schedule allowing [Plaintiff] 20 hours access to the inmate clerical computer."  (Id., ¶ 118.)  Following his job assignment in September 2016, Plaintiff's "work schedule conflicted with [his] computer access schedule," but "Roach would not alter [his] schedule so that [Plaintiff] could work and be permitted the required 20 hours computer access" under the Agreement.  (Id., ¶ 119.)

"After [Plaintiff's] attempts to resolve the issues were unsuccessful, [he] submitted a written grievance regarding prison officials not complying with the terms of the Agreement."  (Id., ¶ 120; see also Docket Entry 26, ¶ 36 ("In approximately October 2016, Plaintiff submitted an administrative grievance regarding the terms of the 2011 Settlement Agreement being breached.").) "[Plaintiff's] grievance made Mr. Roach angry."  (Docket Entry 90, ¶ 120.)  After [Plaintiff] submitted [his] grievance, Mr. Roach threatened that he would go to [Plaintiff's] dorm and take away [Plaintiff's] personal property," causing Plaintiff anxiety.  (Id., ¶ 121.)  Following "the grievance response, [Plaintiff] wrote to a State Superior Court Judge requesting, in part, [that] prison

officials provide [him with] the 20 hours access the Agreement required." (Id., ¶ 122.)

"The North Carolina Superior Court accepted [Plaintiff's] requests and ordered the relief [that he] sought." (Id., ¶ 123; see also Docket Entry 89-5 at 2 (ordering that Dan River prison officials provide Plaintiff "with a usable schedule which allows him a minimum of 20.00 hours access to the stand-alone, non-networked computer he is currently authorized to use, which satisfies the terms of the 2011 Agreement," and that "prison officials include [Plaintiff] in the construction of the new schedule" (emphasis in original)).) Plaintiff also sought and obtained a court order directing NC DPS officials to provide Plaintiff "with access to photocopying services so that he may provide the [c]ourt and [the d]efendant with copies of exhibits and documents he intends to introduce in [a then-pending state-court] action." (Docket Entry 89-5 at 3.) "On January 30, 2017, the orders of the State Superior Court were served on prison officials at Dan River by the Clerk of Court." (Docket Entry 90, ¶ 124.) Immediately thereafter, on

> January 31, 2017, as [Plaintiff] was accessing the computer assigned for [him] to use in the Chaplain's office, Mr. Moore visited [Plaintiff]. It was obvious [Moore] was angry. He ordered [Plaintiff] to shut down the computer and to leave the office, and that [Plaintiff] was not to use the computer anymore. [Plaintiff] asked why and [Moore] said that Mr. Roach said so. [Plaintiff] asked Mr. Moore if [he] had done something wrong, and Mr. Moore responded by telling

28

[Plaintiff] that [Plaintiff] knew what [he] did, and
again ordered [Plaintiff] to leave. [Plaintiff] left.

On February 2, 2017, [Plaintiff] was paged over the
facility's public address system to report to Mr. Roach's
office. When [Plaintiff] reached Mr. Roach's office,
[Roach] yelled at [Plaintiff] regarding the two State
Superior Court orders. As [Roach] was yelling, [Roach]
rhetorically asked [Plaintiff] who [he] thought [he] was.
It was evident Mr. Roach was angry.

(Id., ¶¶ 125-26 (paragraph numbering omitted).)

"Roach informed [Plaintiff that] he was taking the computer
away from [Plaintiff], and that he was resurrecting the word
processor." (Id., ¶ 127.) Roach also "informed [Plaintiff that
he] would no longer use the Chaplain's office, and that [Roach] was
moving [Plaintiff] to the facility's Receiving Area," also called
the "Intake" or "Master Control" area. (Id., ¶ 128 (internal
quotation marks omitted).) "The Dan River Receiving area is the
central hub of the facility, and is similar to a locker room. It
is open-concept. In one corner was the receiving restroom and
intake shower, and in the other corner, Mr. Roach placed a table
and this became [Plaintiff's] assigned location to use the word
processor. In between the table and restroom was the main path for
foot traffic. This was not a secluded area." (Id., ¶ 141.) In
addition, the prison "clotheshouse would use that table to sort
dirty laundry." (Id., ¶ 144.)

"Roach informed [Plaintiff that he] would be using a table in
Receiving for the word processor from 6:00 p.m. - 9:20 p.m. each
evening. [Plaintiff unsuccessfully] attempted to protest" (id.,

29

¶ 129), but "Roach made [Plaintiff] sign a document with the new schedule" (id., ¶ 130). "[Plaintiff] stated that [he] did not agree with the document's contents. Mr. Roach ordered [Plaintiff] to be quiet and demanded that [Plaintiff] sign the document or [Plaintiff] could go to Restricted Housing (solitary confinement) where [Roach] promised [that Plaintiff] would have absolutely no access." (Id.) Dated February 2, 2017, this document states:

> This letter is to serve as notice that the approved communication equipment, a Brother ML-500 Typewriter/Word Processor was returned to you in complete working order on 1-30-17. This equipment has been tested and found to have no issues at this time. This equipment is in working order and is available to you as needed during the allocated time set forth by the facility. Your refusal to use the equipment on 1-31-17 has been documented, but in no way affects the availability of this machine for your use. As always, this facility will provide you with access to this equipment and it will continue to be available to you during the allotted times 6:00pm until 9:20pm seven days a week to include holidays and weekends.

(Docket Entry 89-6 at 2.) "Roach was so angry that as he signed the document he threw his pen." (Docket Entry 90, ¶ 131.)

"After Mr. Roach stopped [Plaintiff] from using the previously agreed upon computer, he set [Plaintiff's] access schedule to the resurrected word processor from 6:00 p.m. to 9:20 p.m. each evening. On paper, this appears to be 23 hours and 20 minutes weekly, or, 3 hours and 20 minutes more than the Agreement demanded," but "[t]he numbers are deceiving." (Id., ¶ 132.) "[Plaintiff] was actually permitted less than 14 hours access per week" (id.) because "Roach scheduled [Plaintiff's] access to the

30

word processor at times where it was impossible for [Plaintiff] to gain access" (id., ¶ 133) due to the guards' change of shift, formal inmate counts, and other logistical issues (see id., ¶¶ 135-46). "[W]hen [Plaintiff] requested Mr. Roach amend the schedule, Mr. Roach told [Plaintiff] that [Plaintiff] had better stop complaining, or he would change [Plaintiff's] access from one o'clock to four o'clock in the morning." (Id., ¶ 133.)

In support of this schedule change, on February 2, 2017, at 3:34 p.m., Roach circulated an email entitled "Inmate Stanley Smith" to various NC DPS officials. (Docket Entry 89-7 at 2.) It states in full:

> Effective immediately and read in line up for several days
>
> Inmate Smith will have access to his Brother ML-500 seven nights a week from 6:00pm until 9:20pm.
>
> This word processor will be kept in Central Control and inmate Smith will use the corner desk in our intake area.
>
> There is also a log that will be kept in Central Control and he must sign it daily when he uses it **OR if he refuses any particular night.** Bottom line is that he must sign regardless.
>
> I want our staff member to log the time in/time out and (legibly) sign as verifying officer.

(Id. (emphasis in original).)

The word processor repeatedly malfunctioned and/or lacked necessary supplies. (See Docket Entry 90, ¶¶ 147-58.) At Roach's direction, "Moore would purchase used word processor equipment of different makes and models from e-commerce sites (such as Craig's

31

List, E-Bay, etc.) and finagle the parts together creating a piecemeal machine, or a Frankensteined, cannibalized conglomeration of parts which never operated as it should." (Id., ¶ 156.) "When Mr. Moore would work on the word processors and cannibalize parts from machine to machine, [Plaintiff's] stored files would be lost. Unlike on a computer, there was no external storage drive on the word processors to transfer saved files." (Id., ¶ 157.)

"On October 30, 2018, [Plaintiff] transferred from Dan River to Rutherford [Correctional Center ("Rutherford Corr.")]." (Id., ¶ 172.) Shortly after this transfer, Rutherford Corr. "officials experienced difficulties locating the necessary supplies for the word processor." (Id., ¶ 174.) "Rutherford Corr.'s management staff inspected the word processor and contacted several local office equipment repair businesses regarding the word processor. The responses did not vary: the word processor was obsolete, rife with mechanical problems, and parts, supplies, and labor costs made the word processor economically irresponsible." (Id., ¶ 175.) "Rutherford Corr. officials contacted Dan River to inquire where they purchased supplies." (Id., ¶ 176.) "Roach insisted that Rutherford Corr. transport the word processor to Dan River and permit Mr. Moore to make all needed repairs." (Id., ¶ 177.) "This was not economically feasible. To send the word processor to Dan River meant that Rutherford Corr.'s lone Transportation Officer would have to drive the word processor to Dan River, wait on the

32

repairs to be made, and then drive the word processor back to Rutherford Corr.," a distance of at least 3 ½ hours in each direction. (Id., ¶ 178.) Instead of acceding to this demand, "Rutherford Corr. officials contacted the ADA Coordinator and the office of surplus property where they acquired an older model non-networked laptop computer loaded with Microsoft Word and a printer for [Plaintiff's] use." (Id., ¶ 179.)

In response to Plaintiff's computer-related allegations, Roach avers in full:

"Regarding use of a non-networked computer, [Roach] insured that Plaintiff was allowed access to a computer while the typewriter was being repaired." (Docket Entry 85-2, ¶ 15.) "The Brother typewriter in question was the exact equipment named in the settlement agreement, and [Roach] as well as other prison staff worked to ensure compliance with the agreement." (Id., ¶ 16.) "As soon as the Brother ML-500 was repaired, Plaintiff was taken off of the computer." (Id., ¶ 17.) "After a very diligent search, which took a lot of time and effort, [Roach's] staff obtained five of these typewriters, so that Plaintiff was never without a backup." (Id., ¶ 18.) "[Roach] and [his] staff simply held [them]selves as well as Plaintiff to the terms of the prior settlement." (Id., ¶ 19.) "Plaintiff was afforded 21 hours a week for access to the Brother typewriter in a secluded area. He was given access 7 nights a week for 3 hours a night." (Id., ¶ 20.) "[Roach]

33

den[ies] that [he] nor [sic] any other named Defendants have ever knowingly or willfully acted in any manner intended to deprive [Plaintiff] of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States." (Id., ¶ 21.)

This denial extends to Plaintiff's pants-related retaliation claim, as to which Roach avers:

"Regarding Plaintiff's allegations involving his clothing, when Plaintiff arrived at the facility, he was wearing clothing that did not match that of the inmate population." (Id., ¶ 7.) "This was a concern on the part of facility management due to the potential for security issues amongst the offender population when one particular offender appears to wear unique clothing." (Id., ¶ 8.) "Due to Plaintiff's special needs, [Roach] consulted with a local cloth/material store and took a pair of inmate clothing for minimum custody inmates and insured that a new set of clothing could be fabricated for Plaintiff that were as close to [sic] the green clothing worn by other minimum custody inmates." (Id., ¶ 9.) "[Roach] then contacted Mountain View Correctional Institution because that facility manufactured inmate uniforms." (Id., ¶ 10.) "[Roach] asked Mountain View officials to make him Plaintiff [sic] several pants exactly like the rest of the inmates wear." (Id., ¶ 11.) "[Roach] then sent Mountain View the 100% cloth material from the local cloth/material store and Mountain View made the

34

uniform to look exactly like that of the other minimum custody inmates." (Id., ¶ 12.) "The set of clothing created at Mountain View differed from that which Plaintiff had initially arrived with." (Id., ¶ 13.) "Due to a change in division heads, there were changes made to inmate uniforms. The front pockets on new uniforms were removed for security reasons. This was a division wide change." (Id., ¶ 14.)

Plaintiff challenges Roach's contentions, first emphasizing that "Roach began his search for cotton material to change [Plaintiff's] clothing from clothing which did accommodate [Plaintiff's] disability to clothing which did not — only after the Orders of the State Superior Court were served." (Docket Entry 90, ¶ 170; see also id., ¶ 169 ("After [Plaintiff] verbally complained to Mr. Roach and other prison officials, and after [Plaintiff] submitted [his] grievance regarding the terms of the Agreement not being honored, and after the State Superior Court served the orders to Dan River prison officials, Mr. Roach commenced his retaliatory attacks towards [Plaintiff].").) In this regard, on February 23, 2017, Roach placed an order for 100% cotton fabric for shirts and pants at Barbee Fabrics of Danville (Virginia) with delivery scheduled for March 10, 2017. (See Docket Entry 89-8 at 2.) Later:

> On September 6, 2017, [Plaintiff] was paged over Dan River's public address system to report to the facility's clotheshouse with all of [his] clothing. The Clotheshouse Officer ordered [him] to turn in all of

35

[his] previously purchased green pants — including the
four pair purchased and issued to [Plaintiff] since [his]
arrival at Dan River.  The clothing items which did
accommodate [his] disability were taken from [him] and
replaced with clothing items which **<u>did not</u>** accommodate
[his] disability.

(Docket Entry 90, ¶ 57 (emphasis in original).)  "When [Plaintiff]
asked why [his] clothing was being changed, the Clotheshouse
Officer responded that he was only doing what Mr. Roach told him to
do."  (<u>Id.</u>, ¶ 58.)  "[Plaintiff] was unaware that Mr. Roach was
going to change the structure of [his] clothing from the clothing
prison officials and [Plaintiff] had agreed upon previously.
[Plaintiff] was not included at all in this drastic lifestyle
change of [his] disability accommodation."  (<u>Id.</u>, ¶ 59.)

"NCDPS has an internal sewing industry managed and operated by
North Carolina Correctional Enterprises ('Enterprise').  Enterprise
manufactures a lot, but not all, of the clothing for the inmate
population."  (<u>Id.</u>, ¶ 60.)  "Enterprise's pattern designs for pants
is for a button-fly closure, limited pockets, limited belt loops
and what [Plaintiff] call[s] tuxedo straps for adjusting the waist,
and are not made of cotton."  (<u>Id.</u>, ¶ 61.)  "Roach had Enterprise
make pants to be issued to [Plaintiff]."  (<u>Id.</u>, ¶ 62.)  "The pants
manufactured by Enterprise do not fit [Plaintiff's] specific and
unique disability accommodation needs."  (<u>Id.</u>, ¶ 63.)  "From
[Plaintiff's] understanding, Enterprise does not even have a
pattern for pants with zippers closure.  Any pants created by
Enterprise for [Plaintiff's] use would not accommodate [his]

36

disability, which was in part what led to the 2007 lawsuit and ultimately the 2011 Agreement." (<u>Id.</u>, ¶ 64.)

Moreover, "[t]he pants issued by Mr. Roach did not have pockets that [Plaintiff] can use or reach. There are no front or back pockets. There is a single pocket on each leg (similar to cargo pants). [Plaintiff is] physically unable to utilize the cargo pocket. [Plaintiff] need[s] accessible pockets, and [Plaintiff] no longer ha[s] them because Mr. Roach took them away from [him]." (<u>Id.</u>, ¶ 65.) In addition, "[t]he pants issued by Mr. Roach have only five belt loops. One located on each hip and three in the back. There are no belt loops from the hip to the front of the pants. Without belt loops, [Plaintiff] ha[s] great difficulty dressing and undressing [him]self. Trips to the restroom are difficult, and sometimes painful." (<u>Id.</u>, ¶ 66.)

"The pattern for making the new pants Mr. Roach issued to [Plaintiff] is from a button fly design. The zipper was added to [Plaintiff's] pants using that button-fly design," which "made the zipper difficult for [Plaintiff] to manipulate." (<u>Id.</u>, ¶ 70.) "Even with the appropriate pants, [Plaintiff] ha[s] to use both hands to zip and unzip [his] pants. Because of the forced design with the new pants, the zipper does not always cooperate and sometimes makes it impossible to fasten/unfasten [his] pants." (<u>Id.</u>) "[Plaintiff] did not suffer this predicament with [his]

37

pants prior to Mr. Roach's altering the agreed upon accommodation."
(Id.)

"When [Plaintiff] reported to Mr. Roach that the clothing he issued [Plaintiff] did not provide the appropriate accommodation, [Plaintiff] was told, 'You got what you are getting.'" (Id., ¶ 71.) "[Plaintiff] made multiple requests that the clothing originally purchased for [him] be returned to [him] so that [he] could function, but Mr. Roach denied every request." (Id., ¶ 72.) "At no time did Mr. Roach or any other prison official approach [Plaintiff] with a plan or idea of making clothing for [Plaintiff] as opposed to purchasing from a local suppl[i]er as [they] had previously agreed. Instead, what [Plaintiff] received was a complete lifestyle change — a change which has completely disrupted [Plaintiff's] ability to care for [his] most basic needs." (Id., ¶ 73.) In particular:

> When Mr. Roach took away [Plaintiff's] clothing which did accommodate [his] disability, [Plaintiff] no longer had accessible pockets; therefore, [he] was no longer capable of keeping in [his] possession [his] prison-issued ID card and other disability assistive devices [he] generally carried in [his] pockets (such as an accommodating eating utensil, assistive devices, etc.)[.] Without [Plaintiff's] ID card, not only was [Plaintiff] not allowed to eat, but [he] was also prohibited from checking out library books, participating in service club fund raisers [sic], accessing the exercise yard, or participating in any other extracurricular activities. As a prisoner, [Plaintiff is] required to have [his] ID card in [his] possession at all times or face disciplinary infraction.

38

(Id., ¶ 74.) Disciplinary infractions can lead to demotion in custody and delay release on parole. (See id., ¶ 76.)

Additionally:

> Since Mr. Roach changed the structure of [his] clothing items, [Plaintiff] had expressed [his] concerns to Mr. Roach and other prison officials [regarding] the difficulties the change caused [him]. [Plaintiff] relayed the problems [he] was having handling [his] ID card to Mr. Roach and other prison officials. As an act of retaliation for [Plaintiff's] grievance to Mr. Roach, he immediately instructed his subordinate officers to make announcements over the public address system informing the inmate population that [inmates] must have [their] ID card on [their] person at all times, and similar messages informing [them] that if [they] do not have [their] ID card in [their] possession, [they] will not be permitted to eat and/or [they] will be cited for disciplinary infraction.

(Id., ¶ 78; see also id., ¶ 79 (expressing belief that "Roach was once again punishing [Plaintiff] for [his] expression of grievances to [Roach]").) Plaintiff elaborated:

> Since Mr. Roach changed out [Plaintiff's] clothing items, [he] was regularly turned away from the serving line at meals because [he] could not carry and produce [his] ID card. This was under the direction of Mr. Roach. This never happened to [Plaintiff] when [he] had clothing which accommodated [his] disability, for [he] had pockets for [his] ID card and other disability assistive items.
>
> After Mr. Roach changed the structure of [Plaintiff's] pants and [he] no longer had accessible pockets, [Plaintiff] would wear [his] coat to meals during the summer months so [he] would have a place to carry [his] ID card and other disability assistive items ([his] coat has pockets — as do all prisoners' coats). Mr. Roach learned what [Plaintiff] was doing and subsequently ordered that all coats be collected by the Clotheshouse Officer. A notice was posted on the inmate bulletin boards that if [inmates] were found in possession of a coat, [they] would face disciplinary

39

action.  [Plaintiff] was afraid to continue wearing [his] coat, for with [his] sentencing class, [he] simply cannot afford disciplinary infractions.

From June to September, 2018, under instructions from Mr. Roach, [Plaintiff] was tuned away from the dining hall without being provided a meal at least 56 times solely because [he] was unable to produce [his] ID Card.  However, other prisoners (non-disabled) were permitted to eat those same meals without producing their ID Card.  Those prisoners would present excuses such as they forgot their card, lost it in the laundry, or left it in their locker.  They were permitted to eat. [Plaintiff], however, was not.  The correctional officer simply keyed in their inmate number (this recorded the entry just as scanning did).  Mr. Roach would not permit staff to do this for [Plaintiff].  Anyone else, yes; [Plaintiff], no.

(Id., ¶¶ 80-82 (paragraph numbering omitted); see also Docket Entry 34 at 13 (admitting, under Rule 36(a)(3), "that an inmate can have his meal information entered into the dining hall computer log by at least two (2) different methods:  (1) by manually scanning the inmate's photo identification card, or (2) by manually entering the inmate's seven (7) digit prison identification number (also known as the inmate's OPUS number)").)

Further, "[o]ther prisoners were regularly issued pants with pockets, but Mr. Roach refused to provide [Plaintiff] with pants with pockets."  (Docket Entry 90, ¶ 83.)  Instead, Roach and Moore "proclaimed [that] the design change in prisoners' pants, which eliminated front and back pockets, was a security measure, and that front and back pockets were now deemed a threat to prison security."  (Docket Entry 26, ¶ 97; see also id., ¶ 98.)  The assertion that pockets constitute "a security issue . . . simply

40

is not true.  Mr. Roach himself ordered that worn pants (with pockets) be cut and re-hemmed into shorts.  The pants (with pockets) were repurposed into shorts (with the very pockets Mr. Roach is alleging to be a security concern) and re-issued to prisoners at his facility."  (Docket Entry 90, ¶ 84; see also Docket Entry 26, ¶ 98 ("The pants with front and back pockets, which Mr. Roach and Mr. Moore proclaimed as threats to security, have been, and are being, and will continue to be, cut, hemmed, and made into short pants and reissued to prisoners — all inside of the prison."); Docket Entry 34 at 12 (admitting, under Rule 36(a)(3), "that Mr. Roach approved for the old-style pants with functional pockets to be sewn into shorts and reissued to the prison population").)

"Prisoners are issued coats during the winter months.  Coats are equipped with numerous pockets.  Coats with pockets have not been classified as threats to security by Mr. Roach — because they are not."  (Docket Entry 90, ¶ 85.)  "Prisoners are issued athletic shorts.  The athletic shorts are equipped with pockets.  The athletic shorts have not been classified as a security threat by Mr. Roach — because they are not."  (Id., ¶ 86.)  Moreover, "Roach directed that pants worn in the knees be cut, hemmed, and made into shorts.  The pants repurposed into shorts are equipped with pockets.  These[] repurposed shorts authorized by Mr. Roach have not been classified as a security threat by Mr. Roach — because

41

they are not." (Id., ¶ 87.) "[Plaintiff's] pants previously purchased to accommodate [his] disability, which were equipped with functional pockets, are not a security threat." (Id., ¶ 88.)

In addition, Plaintiff notes that "[t]he pants purchased by prison officials for [him] while [he] was classified as medium custody were khaki in color, a color much different than the [brown] color other prisoners were issued. Though [he] was dressed differently than the other prisoners, this did not cause any animosity or disdain from other prisoners because [he] was dressed differently than they were; nor did the clothing [he] wore cause any security disruptions for prison staff." (Id., ¶ 48 (citation omitted).) Plaintiff does "wear different clothing from other prisoners" and "ha[s] accommodation and assistive devices that other prisoners do not have. Sometimes, when a prisoner is new at the facility and first lays eyes on [him], they may ask why, and [Plaintiff] will simply tell them it is because of [his] disability. They understand. [Plaintiff] ha[s] never found a prisoner to harbor animosity, resentment, or even jealousy because [he is] different." (Id., ¶ 49.)

"After Mr. Roach changed the style of [his] clothing, [Plaintiff] wrote to numerous facility and prison officials. This included the facility's medical department." (Id., ¶ 90.) "On November 9, 2017, [Plaintiff] was paged to the medical department by Ms. Dory, the Nurse Supervisor. She and [Plaintiff] discussed

42

[his] clothing issues and the difficulty [he] was having with the change in [his] clothing. This was upsetting and frustrating for [Plaintiff], and Ms. Dory could sense that." (Id., ¶ 91.)

Finally, despite the fact that, in previous transfers, all of Plaintiff's "clothing items transferred with [him]" (id., ¶¶ 92-93), when Plaintiff transferred from Dan River to Rutherford Corr., the clothing that accommodated his disability did not transfer with him (see id., ¶¶ 94-101). As concerns that matter, Plaintiff explains:

> On October 30, 2018, as [he] was being transferred away from Dan River, [he] noticed that [his] property was sorted into two groups. As [his] property was being loaded into the car, [he] asked why the second group of [his] property which included clothing items Mr. Roach and Mr. Moore had taken away from [Plaintiff] was not being loaded into the vehicle. Mr. Moore told [Plaintiff] that because there was no room in the car those items of [his] property were being shipped separately to Rutherford Corr.'s "off-site storage facility."

> Mr. Moore, under the direction of Mr. Roach, specifically rode with the Transportation Officer driving [Plaintiff] from Dan River to Rutherford Corr. It was not routine for Mr. Moore to assist with the processing of a regular population inmate for transfer (such as [Plaintiff]), or for him to accompany the Transportation Officer in an actual transfer.

> Upon [their] arrival at Rutherford Corr., Mr. Moore met with the Rutherford Corr. administrative staff and labeled [Plaintiff] as a trouble-maker. [Plaintiff] was labeled a troublemaker by Mr. Roach via Mr. Moore solely because [he] participated in a federal civil rights action in which [he] challenged [his] conditions of confinement and because [he] grieved against Mr. Roach and Dan River officials for not honoring the terms of [the] Agreement reached in that action. [Plaintiff] know[s] this because as soon as Mr. Moore and the Dan

43

River Transportation Officer departed Rutherford Corr.,
[Plaintiff] was summoned to Rutherford Corr.'s
Administrative office and told so by the individuals Mr.
Moore had met with.

As [Plaintiff] was being processed into Rutherford
Corr., [Plaintiff] asked the processing officer, Officer
James Vallecillo, where their off-site storage facility
was located. He told [Plaintiff that] Rutherford Corr.
did not have an off-site storage facility. At that
moment [Plaintiff] felt certain that Mr. Moore had
intentionally been untruthful with [Plaintiff] as to why
[his] clothing items did not transfer with [him] as they
normally would have.

[Plaintiff] relayed [his] requests to Rutherford
Corr. facility officials [regarding his] desire to be
reunited with [his] property, which included the clothing
items taken away from [him] by Mr. Roach and Mr. Moore.
Rutherford Corr. facility officials informed [Plaintiff]
that they made repeated attempts to communicate with Dan
River officials to have the clothing items returned to
[Plaintiff], but Mr. Roach and Mr. Moore were not
forthcoming with them.

(Id., ¶¶ 95-99 (paragraph numbering and citation omitted); accord

id., ¶ 173.)

According to Plaintiff:

Mr. Roach and Mr. Moore intentionally did not send
all of [Plaintiff's] clothing items with [Plaintiff] as
[he] transferred away from Dan River, for they knew that
if they did, the items would be returned to [Plaintiff]
by the receiving facility — and Mr. Roach did not want
that.

Mr. Roach's confiscation of [Plaintiff's] clothing
which accommodated [his] disability served absolutely no
penological purpose other than to harass, belittle,
intimidate, and retaliate against [Plaintiff] for the
expression of [his] grievances and for [his] previous
civil rights litigation in which [he] had successfully
litigated [his] conditions of confinement.

(Id., ¶¶ 101-02 (paragraph numbering omitted).)

44

## DISCUSSION

## I. Relevant Standards

## A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists

45

and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996). Nevertheless, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248.

### B. ADA/Rehabilitation Act

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act declares that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The ADA and Rehabilitation Act both apply to state prisons. <u>See</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 716 n.4 (2005) ("Every State . . . accepts federal funding for its prisons."); <u>Pennsylvania Dep't of Corr. v. Yeskey</u>, 524 U.S. 206, 213 (1998) (holding that "the plain text of Title II of the ADA unambiguously extends to state prison inmates").

As the United States Court of Appeals for the Fourth Circuit has explained:

Title II of the ADA and Section 504 of the Rehabilitation Act prohibit discrimination against an individual because of his or her disability. 29 U.S.C. § 794(a) (prohibiting discrimination on the basis of disability against an "otherwise qualified individual with a disability" in the administration of federal programs); 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

"Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (internal quotation marks omitted). To establish a violation of either statute, plaintiffs must prove "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016).

The ADA's Title II and the Rehabilitation Act "differ only with respect to the third element, causation." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). "To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Id.* at 461-62 (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999)).

Wicomico Nursing Home v. Padilla, 910 F.3d 739, 750 (4th Cir. 2018) (brackets in original).

"A successful plaintiff in a suit under Title II of the ADA or [Section] 504 of the Rehabilitation Act is generally entitled to a 'full panoply' of legal and equitable remedies." Paulone v. City

47

of Frederick, 787 F. Supp. 2d 360, 373 (D. Md. 2011). However, as this Court (per Chief Judge Schroeder) previously explained:

> Compensatory damages are only available to a successful plaintiff in a suit under Title II of the ADA or § 504 of the Rehabilitation Act "upon proof of intentional discrimination or disparate treatment, rather than mere disparate impact." Paulone[,] 787 F. Supp. 2d [at 373] (citing Pandazides v. Va. Bd. of Educ., 13 F.3d 823, 829-30 & n.9 (4th Cir. 1994)). A plaintiff "need not show 'discriminatory animus' to prevail on a claim for damages under Title II of the ADA or § 504 of the Rehabilitation Act." Id. (citing Pandazides, 13 F.3d at 830 n.9). While the Fourth Circuit has not specifically addressed the standard required for proving intentional discrimination, the majority of circuits to have decided the issue have adopted a deliberate indifference standard, as have some district courts within the Fourth Circuit. Green v. Cent. Midlands Reg'l Transit Auth., No. 3:17-cv-02667-CMC, 2019 WL 1765867, at *6 n.15, *9-10, *9 n.24 (D.S.C. Apr. 22, 2019) (noting that the Fourth Circuit has not ruled on the applicable standard for claims for damages under Title II of the ADA or similar claims under the Rehabilitation Act, rejecting the "discriminatory animus" standard and adopting the "deliberate indifference" standard applied by "the vast majority, if not all, of the circuit courts that have decided the issue" (collecting cases)); Godbey v. Iredell Mem'l Hosp., Inc., No. 5:12-cv-00004-RLV-DSC, 2013 WL 4494708, at *4-6 (W.D.N.C. Aug 19, 2013) (observing that "the Fourth Circuit has not yet determined what standard of proof a plaintiff must meet to demonstrate discriminatory intent under the [Rehabilitation Act,]" noting that the Second, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted the "deliberate indifference" standard for discriminatory intent while the Fifth Circuit has rejected it, and applying the deliberate indifference standard (collecting cases)).

(Docket Entry 14 at 5-6.) "In order to prove deliberate indifference, 'a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood.'" Bone v. University of N.C.

48

Health Care Sys., No. 1:18cv994, 2021 WL 395547, at *2 (M.D.N.C. Feb. 4, 2021) (quoting Silva v. Baptist Health S. Fla., Inc., 856 F.3d 824, 831 (11th Cir. 2017)), recommendation adopted, slip op. (M.D.N.C. Mar. 31, 2021).

## C. Retaliation Claims

"It is beyond dispute that prison officials cannot retaliate against inmates for exercising a constitutional right." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017). Moreover, "[t]he Supreme Court has long held that prisoners 'retain the constitutional right to petition the government for the redress of grievances.'" Id. at 543 n.7 (quoting Turner v. Safley, 482 U.S. 78, 84 (1987)). "This right 'advance[s] personal expression,' and 'extends to all departments of the Government,' including administrative agencies." Id. (brackets in original) (citation omitted) (first quoting Borough of Duryea v. Guarnieri, 564 U.S. 379, 388 (2011); then quoting California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)). As such, an inmate's "right to file a prison grievance free from retaliation [i]s clearly established under the First Amendment." Id. at 545; see also id. (observing that, "[c]onsistent with fundamental constitutional principles and common sense, [federal appellate courts] have had little difficulty concluding that prison officials violate the First Amendment by retaliating against inmates for filing grievances").

49

In addition, "[s]tate prisoners have a constitutional right of meaningful access to the courts which a state may not abridge nor impair; nor may it impermissibly burden its exercise." Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1978) (collecting cases); see also id. (explaining that, "[o]nce judicial proceedings have been commenced, the state may not punish a prisoner for having sought judicial remedies"). Thus, as with the Supreme Court, "th[e] Fourth Circuit] has long held that prison officials may not retaliate against prisoners for exercising their right to access the courts, which is a component of the right to petition for redress of grievances." Booker, 855 F.3d at 544 (citation omitted). Notably, a prisoner does not need to "succumb entirely or even partially to the threat" for a constitutional violation to occur. Hudspeth, 584 F.2d at 1348. "It is enough that the threat was intended to impose a limitation upon the prisoner's right of access to the court and was reasonably calculated to have that effect." Id.

"To state a colorable First Amendment retaliation claim, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (internal quotation marks and brackets omitted). For

50

purposes of a first-amendment retaliation claim, "a plaintiff
suffers adverse action if the defendant's allegedly retaliatory
conduct would likely deter 'a person of ordinary firmness' from the
exercise of First Amendment rights." Constantine v. Rectors &
Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005).
"In order to establish [a] causal connection, a plaintiff in a
retaliation case must show, at the very least, that the defendant
was aware of her engaging in protected activity." Id. at 501.
"There must also be some degree of temporal proximity to suggest a
causal connection." Id. (explaining that "[a] lengthy time lapse
between the [defendant] becoming aware of the protected activity
and the alleged adverse . . . action . . . negates any inference
that a causal connection exists between the two" (internal
quotation marks omitted) (ellipses in original)).

Under the so-called Mt. Healthy framework, if "an inmate shows
that protected conduct was a substantial or motivating factor in a
prison guard's decision to take adverse action, . . . the burden of
proving a permissible basis for taking that action then shifts to
the person who took it." Martin, 977 F.3d at 300. A defendant can
defeat a retaliation claim "by proving it would have reached the
same decision . . . in the absence of the protected conduct. A[
defendant] must make this showing by a preponderance of the
evidence." Id. at 299 (internal quotation marks and citation
omitted) (ellipsis in original); see also id. at 297 (extending

51

burden-shifting framework from <u>Mt. Healthy City School District Board of Education v. Doyle</u>, 429 U.S. 274 (1977), to prison context). "If the defendant fails to carry that burden, the inference is that 'but for' causation . . . has been shown: the plaintiff would not have been harmed had his rights not been violated by the defendant." <u>Id.</u> at 299 (ellipsis in original).

## II. Analysis

### A. Preliminary Matter

As an initial matter, Plaintiff contends that Defendants' failure to participate in the discovery process should preclude entry of summary judgment in their favor. (<u>See</u> Docket Entry 75 at 7.) Specifically, Plaintiff asserts that he "made every effort known to him to participate in the discovery process," but "Defendants completely refused to participate in the process, even after the Court compelled them to do so." (<u>Id.</u> (citing Docket Entry 75-1, ¶¶ 7-32); <u>see also id.</u> ("Plaintiff's Affidavit clearly establishes that Defendants did not participate in the discovery process.").) According to Plaintiff, "[a c]ourt should not grant summary judgment against a party who has not had an opportunity to pursue discovery **or** whose discovery requests have not been answered." (<u>Id.</u> (emphasis in original) (citing <u>Ingle v. Yelton</u>, 439 F.3d 191, 196 (4th Cir. 2006), and <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1219 (11th Cir. 2000)).)

52

Defendants did not respond to this argument. (See Docket Entry 85; see also Docket Entries dated Jan. 11, 2021, to present (lacking reply to Docket Entry 75).) Ordinarily, a party who fails to respond to an argument concedes it. See, e.g., Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (finding that "[the d]efendants conceded the [disputed] issue by failing to respond to it at the appropriate time," and noting that, under both this Court's Local Rules and as a "general principle," a litigant "who fails to address an issue . . . concede[s] the issue") (collecting cases). Arguably on this basis alone the Court could deny the Motions. However, because (as discussed below) material factual disputes preclude entry of summary judgment in Defendants' favor, the Court need not consider the appropriateness of denying summary judgment for discovery failures. See Leigh, 212 F.3d at 1219.

## B. ADA/Rehabilitation Act Claims

Defendants first argue that "[t]he ADA and the Rehabilitation Act do not provide any causes of action against individual defendants in their in[d]ividual capacities." (Docket Entry 62 at 3 (all-cap and bold font omitted).) The Court already determined that Plaintiff cannot pursue individual-capacity ADA and Rehabilitation Act claims against Defendants. (See, e.g., Docket Entry 8 at 4; Docket Entry 14 at 10.) Accordingly, the Court dismissed Plaintiff's individual-capacity ADA and Rehabilitation

53

Act claims (see Docket Entry 14 at 10-11) and permitted only "Plaintiff's damages claims against Defendant Michael Roach in his official capacity as an employee of the [NC DPS] for disability discrimination under the [ADA] and the Rehabilitation Act to proceed" (Docket Entry 16 at 1). (See id. at 1-2.) Defendants' first argument (see Docket Entry 62 at 3-4) thus fails to justify summary judgment in their favor on any of Plaintiff's remaining claims.[9]

Defendants next argue that, to state a claim under the ADA, a "disabled plaintiff [must] allege that his or her mistreatment 'was motivated by either discriminatory animus or ill will due to disability.'" (Id. at 4 (quoting Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 112 (2d Cir. 2001)).) However, the ADA and Rehabilitation Act impose no such requirement. See, e.g., Bone, 2021 WL 395547, at *10-13. In fact, as detailed previously, the Court (per Chief Judge Schroeder) already has held in this case that Plaintiff "need not show discriminatory animus to prevail on a claim for damages under Title II of the ADA or § 504 of the Rehabilitation Act." (Docket Entry 14 at 6 (internal quotation

---

9  Defendants also assert that "Plaintiff's transfer to a new prison moots any request for injunctive relief regarding his remaining claims," as well as that, "[r]egarding any alleged loss of sentence reduction credits, the instant lawsuit is not the appropriate vehicle to address those claims." (Id. at 6; see id. at 6-7.)  As with Plaintiff's individual-capacity ADA and Rehabilitation Act claims, the Court has already resolved such issues. (See Docket Entries 8, 14.)

54

marks omitted).)   Accordingly, Defendants' second argument also fails to justify summary judgment.

Defendants further argue that "[a] close examination of the underlying facts and context shows that Plaintiff was in fact adequately accommodated."   (Docket Entry 62 at 5.)[10]   In this regard, Defendants maintain:

> In September of 2016, Plaintiff was transferred to Dan River Prison Work Farm.  [D.E. 2].  When Plaintiff started working in the kitchen at the facility, he wore shoes that did not adhere to facility safety standards. Declaration of Michael Roach at ¶ 10 (attached to Appendix as Exhibit 1) (hereinafter "Roach Dec."). Facility safety standards are in place to protect the safety of offenders.  Due to the lack of approved footwear, Plaintiff was not allowed to work in the kitchen area of the facility.  Roach Dec. at ¶ 12. Plaintiff was subsequently taken to a medical professional to be fitted for a custom made pair of shoes that accommodated his disability, while adhering to safety standards.  Roach Dec. at ¶ 13.  These custom orthotics/footwear were provided to Plaintiff at no expense to himself.  Roach Dec. at ¶ 14.  After being provided the custom footwear, Plaintiff refused to wear such, and opted to wear a pair that was provided by his family.  See Roach Dec. at ¶ 15-16; Orthotic medical records (attached to Appendix as Exhibit 2 at Bates pages 2-5, previously provided to Plaintiff).

> Defendants adequately accommodated Plaintiff.  The only reason Plaintiff was temporarily not permitted to work in the kitchen area was due to his initial footwear failing to meet safety standards.  A careful examination

_____

10  In other words, Defendants here challenge only the third prong of ADA/Rehabilitation Act claims, namely whether Plaintiff was "denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability," Lamone, 813 F.3d at 503.  (See Docket Entry 62 at 4-6 (not contesting that Plaintiff satisfies disability and otherwise qualified prongs of ADA/Rehabilitation Act claims).)

55

of the facts reveals that Plaintiff has not shown that
Defendants required Plaintiff to use footwear on the job
that was different than that used by able bodied
prisoners or that Defendants provided the required
footwear for free to non-disabled prisoners to work in
the kitchen. Further, Plaintiff has not demonstrated any
ill-will or animus directed towards him regarding his
disability and the required footwear. Therefore, the
Complaint fails to allege facts showing that Defendants
treated Plaintiff differently than his nondisabled
counterparts resulting in his exclusion from the kitchen
job.

(Docket Entry 62 at 5-6.)

However, viewed in the light most favorable to Plaintiff, the
record reveals the following:

Due to Plaintiff's disability, steel-toed boots cause him
significant pain and make walking difficult. (Docket Entry 75-1,
¶¶ 37-38, 46-47; see also Docket Entry 76-6 at 2 (ADA Request Form
reflecting inability to wear steel-toed shoes due to pain and
difficulty walking).) Accordingly, for decades, NC DPS officials
provided Plaintiff an exemption from wearing steel-toed boots for
prison jobs. (Docket Entry 75-1, ¶¶ 48, 54; Docket Entry 76-6 at
2.) Following Plaintiff's transfer to Dan River, Roach expressed
displeasure regarding Plaintiff's Settlement Agreement with NC DPS
officials (see, e.g., Docket Entry 90, ¶ 56), informing Plaintiff
that Roach "did not like the terms of the 2011 Settlement Agreement
and he was going to do everything he could to take as much of it as
he could away from [Plaintiff]" (Docket Entry 75-1, ¶ 65).
Plaintiff obtained a job, through the Inmate Job Assignment
Program, as a kitchen inventory clerk in September 2016, but

56

shortly thereafter Roach removed Plaintiff from his position because "Roach did not approve of the footwear Plaintiff wore to accommodate his disability" (Docket Entry 34 at 10). (Docket Entry 26, ¶¶ 13-14; Docket Entry 75-1, ¶ 70.)

Other prisoner officials provided that footwear to Plaintiff to "work the exact same position in another prison facility." (Docket Entry 75-1, ¶ 61.) Nevertheless, Roach insisted that Plaintiff wear steel-toed boots, even though, "[o]bviously, [Plaintiff] do[es]n't need steel toes to protect toes that don't exist" (Docket Entry 76-4 at 2), and refused to "permit any other consideration or accommodation" (Docket Entry 75-1, ¶ 42; see also, e.g., Docket Entry 34 at 11 (admitting that "Roach would not approve for Plaintiff to be provided any footwear which was not steel toed")). Roach continued his insistence on steel-toed shoes even after Plaintiff submitted a formal ADA Request Form, in November 2016, indicating that Plaintiff remains "unable to wear steel-toed shoes/boots" because "they [are] difficult for [Plaintiff] to walk in" and "are very painful and cause a great amount of discomfort" (Docket Entry 76-6 at 2). (See, e.g., Docket Entry 66 at 1 (reflecting provision of steel-toed boots on March 16, 2017), 4 (reflecting continued NC DPS position in May 2017 that Plaintiff should wear "Dr. Comfort steel toed boots size 10 W from Hanger Clinic[] to perform job at [Dan River]"); see also Docket

Entry 76-7 at 2 (March 2017 medical report indicating Plaintiff reported newly provided steel-toed boots caused pain).)

Roach refused to permit Plaintiff to work at the kitchen job using the boots that NC DPS officials previously provided for such work. (See, e.g., Docket Entry 34 at 10-11; Docket Entry 75-1, ¶ 61.) Ultimately, Plaintiff purchased, at his own expense, composite-toed boots to return to job. (See Docket Entry 66 at 4; Docket Entry 34 at 11.) However, "non-disabled prisoners are provided footwear for participation in the Inmate Job Assignment Program at no cost to the prisoner." (Docket Entry 34 at 11.) Due to Roach's insistence on steel-toed boots, Plaintiff remained unable to work at his kitchen job for many months. (See, e.g., Docket Entry 26, ¶ 14 (reflecting that Roach removed Plaintiff from job in approximately October 2016); Docket Entry 66 at 4 (reflecting in May 2017 that Plaintiff obtained alternative (non-steel-toed) work boots through family).)

Under these circumstances, a reasonable fact-finder could find both that Roach "denied [Plaintiff] the benefits of" the Inmate Job Assignment Program "or otherwise discriminated against [Plaintiff], on the basis of [his] disability," Lamone, 813 F.3d at 503, and that, in so doing, Roach acted with deliberate indifference, see Bone, 2021 WL 395547, at *2. Therefore, the Court should deny Defendants' request for summary judgment on Plaintiff's ADA and Rehabilitation Act claims.

58

## C. Retaliation Claims

Defendants next assert that "Plaintiff has failed to show a legitimate claim of retaliation." (Docket Entry 85 at 3 (all-cap and bold font omitted).) According to Defendants, the record does not reveal retaliation and, in any event, "Plaintiff has also failed to show causation" (id. at 6). (See id. at 3-7.) More specifically, Defendants assert:

> As outlined in the attached affidavit of Michael Roach, when Plaintiff arrived at the facility, he was wearing clothing that did not match that of the inmate population. Declaration of Michael Roach at ¶ 7 (attached to Appendix as Exhibit 1) (hereinafter "Roach Dec."). Based on prior history and knowledge of the inmate population at the facility, Defendants recognized that an individual who doesn't match the inmate population may be subject to harassment and/or unwanted attention from other inmates. Roach Dec. at ¶ 8. In addition to the security concerns that Plaintiff's clothing presented, Defendants were aware of that [sic] they were under obligation to provide clothing to Plaintiff that comported with a prior court settlement. Roach Dec. at ¶ 19[;] also see Prior court settlement documents (attached to Appendix as Exhibit 2)[.] Defendant Roach then consulted with a local cloth/material store and took a pair of inmate clothing for minimum custody inmates and insured that a new set of clothing could be fabricated for Plaintiff that were as close to [sic] the green clothing worn by other minimum custody inmates. Due to security precautions, new uniforms at the time were not permitted to have pockets. Roach Dec. at ¶ 9-14.
>
> In addition to the provisions regarding Plaintiff's clothing, Defendants were also aware of their obligations regarding Plaintiff's access to a typewriter under the prior case settlement. Roach Dec. at ¶ 19. Pursuant to the agreement, Plaintiff was to be provided a Brother typewriter due to his physical limitations that preclude him from writing. When this typewriter was in disrepair, Defendant Roach insured that Plaintiff was supplied a computer while staff searched for a replacement

59

typewriter.  Plaintiff was then supplied a replacement typewriter and Defendants maintained replacement typewriters so that Defendants would remain in compliance with the prior settlement.  Plaintiff was afforded 21 hours a week for access to the Brother typewriter in a secluded area.  Roach Dec. at ¶ 15-18.

Given the facts as outlined and series of events, no retaliation claim has been made.  While Plaintiff attempts to produce direct evidence of retaliation or a chronology of events from which retaliation may plausibly be inferred, he has failed to do so.

(Id. at 4-5.)

Defendants further contend:

Plaintiff has also failed to show causation.  The Fourth Circuit recently clarified its test for causation in prison retaliation cases.  If the plaintiff shows that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action," the burden shifts to the defendant to show that he had a "permissible basis" for taking the adverse action.  See Martin[, 977 F.3d 294.]  Here, no burden-shifting is necessary, because, even if Defendants' actions concerning Plaintiff's clothing and computer access were mere ruses and constituted adverse action, Plaintiff has failed to make the requisite preliminary showing that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action."  Id.  Plaintiffs establishing such a causal link must at least show (1) that the defendant had knowledge of the plaintiff's protected conduct, and (2) that there was temporal proximity between the protected conduct and the adverse action.  Constantine[,] 411 F.3d [at] 501[.]

(Docket Entry 85 at 6-7.)  Defendants do not further develop their

causation argument.  (See generally Docket Entry 85.)

Viewed in the light most favorable to Plaintiff, though, the

record reveals, inter alia:

During his incarceration in medium custody — a heightened security setting involving prisoners deemed less well-behaved than in minimum custody (Docket Entry 90, ¶ 46) — NC DPS officials provided Plaintiff with khaki-colored clothing even though other medium-security prisoners wore brown clothing. (Id., ¶¶ 47-48.) Upon Plaintiff's promotion to minimum custody, where inmates wear green clothing, NC DPS officials acquired green pants for Plaintiff that met his accommodation needs, with two front and two rear pockets as well as normal belt loops. (See id., ¶¶ 42, 46, 50.) Once officials received these new green pants for Plaintiff, they transferred him from Warren C.I. to Dan River, where the ADA Coordinator (who subsequently became the Dan River Warden (see id., ¶¶ 53-54)), purchased four additional pairs of such pants for Plaintiff. (See id., ¶¶ 51, 55.) Although Plaintiff wears different clothing from the other inmates, it has never caused issues with other inmates or security disruptions for prison staff. (Id., ¶¶ 48-49.)

The Settlement Agreement that resolved Plaintiff's previous ADA lawsuit entitles Plaintiff to use of a Brother ML 500 electric word processor six days a week for a total of 20 hours. (See Docket Entry 85-3 at 3.) The Settlement Agreement also authorizes substitution of the Brother ML 500 word processor, upon agreement from "[Plaintiff] and an official ADA Coordinator," if the word processor becomes economically infeasible for the NC DPS

61

or a poor accommodation choice for Plaintiff. (Id. at 4.)
Plaintiff's disability caused difficulties operating the word
processor and its age and obsolescence both necessitated frequent
repairs and made such repairs challenging and costly. (See Docket
Entry 90, ¶¶ 107-11.) Accordingly, during Plaintiff's
incarceration at Warren C.I., prison officials, including an ADA
Coordinator, and Plaintiff agreed to retire the word processor in
favor of a stand-alone, non-networked desktop computer and printer
for Plaintiff's written communications. (See id., ¶¶ 110-12.)
When Plaintiff transferred to Dan River, the Dan River Warden
provided for Plaintiff's access to a non-networked, standalone
computer and printer in the Chaplain's Office for 20 hours a week.
(See id., ¶¶ 117-18.)

When Plaintiff obtained the prison kitchen job, his work
schedule conflicted with his computer access schedule, but Roach
would not alter his schedule to accommodate both work and computer
access, prompting Plaintiff to submit a grievance regarding
noncompliance with the Settlement Agreement. (See id., ¶¶ 119-20.)
This grievance angered Roach, who threatened to take Plaintiff's
personal property. (See id., ¶¶ 120-21.) Plaintiff thereafter
petitioned a North Carolina Superior Court to order NC DPS
officials to provide him with both a collaboratively designed
"usable schedule which allows [Plaintiff] a minimum of 20.00 hours
access to the stand-alone, non-networked computer he is currently

62

authorized to use" (Docket Entry 89-5 at 2 (emphasis in original)), as well as "access to photocopying services so that he may provide the [c]ourt and [the d]efendant with copies of exhibits and documents he intends to introduce in [a then-pending state-court] action" (id. at 3). The State Superior Court ordered the requested relief on January 25, 2017 (see id. at 2-3), and deposited its orders for service via first class mail on January 27, 2017 (see id. at 4). On January 30, 2017, Dan River officials received these orders. (See Docket Entry 90, ¶ 124.)

The following morning, as Plaintiff used the computer in the Chaplain's Office, a visibly angry Moore ordered him to shut down the computer, leave the office, and not use the computer again. (See id., ¶ 125.) Moore indicated that this directive originated with Roach. (See id.) On February 2, 2017, Plaintiff reported to Roach's office as directed, where Roach yelled at Plaintiff "regarding the two State Superior Court orders" (id., ¶ 126) and informed him both that Roach "was taking the computer away from [Plaintiff], and that [Roach] was resurrecting the word processor" (id., ¶ 127) for use in the facility's high-traffic Receiving Area from 6 p.m. to 9:20 p.m. each night (see id., ¶¶ 128-29, 141-43). On pain of solitary confinement, Roach ordered Plaintiff to sign a document notifying him of the return of the word processor and new schedule. (See id., ¶ 130; see also Docket Entry 89-6 at 2 (signed

document).)  "Roach was so angry that as he signed the document he threw his pen."  (Docket Entry 90, ¶ 131.)

That same day, Roach circulated an email to prison staff, informing them that "[e]ffective immediately" Plaintiff would have access to the word processor at a desk in the intake area from 6 p.m. to 9:20 p.m. each night.  (Docket Entry 89-7 at 2 (emphasis added).)  Due to, inter alia, guard shift changes and formal prisoner counts, this schedule affords Plaintiff "less than 14 hours [of] access per week" (Docket Entry 90, ¶ 132).  (See id., ¶¶ 132-46.)  When Plaintiff asked Roach to modify the schedule, Roach threatened to change Plaintiff's access time to 1 a.m. instead.  (See id., ¶ 133.)  Roach tasked Moore with repairing the word processor, which worked poorly and broke frequently, an occurrence that resulted in the loss of Plaintiff's stored files. (Id., ¶¶ 147-50, 153-58.)  After Plaintiff transferred from Dan River to Rutherford Corr., Defendants attempted to ensure Plaintiff's continued use of the word processor by having Moore continue handling its repairs.  (See id., ¶¶ 174-78.)  Instead, Rutherford Corr. officials, an ADA coordinator, and other NC DPS personnel secured a non-networked computer with printer for Plaintiff's use.  (Id., ¶ 179.)

Also in February 2017, Roach ordered 100% cotton fabric for shirts and pants from a fabric store in Danville, Virginia, with delivery scheduled for March 10, 2017.  (See Docket Entry 89-8 at

64

2 (reflecting February 23, 2017, order by "Mike Roach").)  Roach directed the NC DPS facility who makes prison uniforms to utilize this fabric to construct new clothing for Plaintiff, a process that required the facility to modify its usual pant design from a button-fly to zipper closure. (See, e.g., Docket Entry 85-2, ¶¶ 9-12; Docket Entry 90, ¶¶ 60-64, 70.)  Without warning to Plaintiff, on September 6, 2017 – more than a year after Plaintiff's arrival at Dan River (see, e.g., Docket Entry 90, ¶ 52 (indicating Plaintiff "was housed at Dan River from August 22, 2016 through October 30, 2018")) — a Dan River employee acting on Roach's orders confiscated Plaintiff's disability-accommodating green pants and replaced them with pants that Roach ordered NC DPS's internal clothing manufacturers to make for Plaintiff using this 100% cotton fabric. (See id., ¶¶ 57-62.)  These new pants lacked the pockets and belt loops necessary to accommodate Plaintiff's disability, causing him difficulty dressing and undressing as well as preventing him from carrying, inter alia, necessary assistive devices and his ID badge, required for myriad prison activities. (See, e.g., id., ¶¶ 61-66, 69-71, 74.)  Further, because the NC DPS grafted a zipper onto a button-fly pant design, the zipper on these pants remains difficult for Plaintiff to operate and "sometimes makes it impossible to fasten/unfasten [his] pants." (Id., ¶ 70.)

When Plaintiff informed Roach that the new clothing "did not provide the appropriate accommodation, [Roach] told [Plaintiff],

65

'You got what you are getting.'" (Id., ¶ 71.) Roach also denied Plaintiff's "multiple requests that the clothing originally purchased for [him] be returned to [him] so that [he] could function." (Id., ¶ 72.) Further, in response to Plaintiff "relay[ing] the problems [that he] was having handling [his] ID card to [Roach,] . . . . [Roach] immediately instructed his subordinate officers to make announcements over the public address system informing the inmate population that [they] must have [their] ID card on [their] person at all times, and similar messages informing [them] that if [they] do not have [their] ID card in [their] possession, [they] will not be permitted to eat and/or [they] will be cited for disciplinary infraction." (Id., ¶ 78.) Roach also directed NC DPS staff to refuse to serve Plaintiff in the dining hall if he did not produce his ID card, while staff permitted other NC DPS prisoners to eat without their ID cards. (Id., ¶ 82.) Further, upon learning that Plaintiff utilized his coat pockets to carry his "ID card and other disability assistive items" during the summer, Roach ordered NC DPS officials to collect all coats. (Id., ¶ 81.)

Defendants claimed that front and back pants pockets presented a security threat. (See, e.g., Docket Entry 26, ¶¶ 97-98.) However, NC DPS inmates continue to wear athletic shorts and coats with pockets and "Roach himself ordered that worn pants (with pockets) be cut and re-hemmed into shorts. The pants (with

66

pockets) were repurposed into shorts (with the very pockets Mr. Roach is alleging to be a security concern) and re-issued to prisoners at his facility." (Docket Entry 90, ¶ 84; see id., ¶¶ 85-87.) Moreover, upon Plaintiff's transfer to Rutherford Corr., Moore (1) participated in the separation of Plaintiff's property and failure to transfer Plaintiff's disability-accommodating pants to his new facility, falsely informing Plaintiff that his withheld property would go to a non-existent storage location, and (2), at Roach's behest, directly informed Rutherford Corr. staff that Plaintiff "[w]as a trouble-maker" because he "participated in a federal civil rights action in which [he] challenged [his] conditions of confinement, and because [Plaintiff] grieved against Mr. Roach and Dan River officials for not honoring the terms of [the] Agreement reached in that action" (id., ¶ 97). (See id., ¶¶ 95, 98, 101.) Despite efforts from Rutherford Corr. staff to obtain Plaintiff's remaining property, including his confiscated clothing items, "[Defendants] were not forthcoming with them." (Id., ¶ 99.) Per Plaintiff, Defendants "intentionally did not send all of [his] clothing items with [him] as [he] transferred away from Dan River, for they knew that if they did, the items would be returned to [Plaintiff] by the receiving facility — and Mr. Roach did not want that." (Id., ¶ 101.)

Accepting these allegations as true, Plaintiff has established that he engaged in protected first-amendment activity; that

67

Defendants took actions adversely affecting his first-amendment rights; and that a causal relationship exists between Plaintiff's protected activity and Defendants' conduct. See, e.g., Cecil v. Winston, No. 7:20-cv-349, 2021 WL 3642054, at *7-8 (W.D. Va. Aug. 17, 2021) (finding that inmate established plausible retaliation claim where defendants allegedly "threatened to move [inmate] to 'harsher living conditions' if he continued to pursue the grievance procedure" and said "'I bet you won't file any more lawsuits will you'" upon inmate's transfer to isolation pod, explaining that those statements "and the temporal connection between [the inmate's] protected first amendment conduct and his placement in segregated and isolated housing sufficiently allege a causal connection"); Mateen v. Clarke, No. 7:19-cv-620, 2020 WL 6582833, at *5 (W.D. Va. Nov. 10, 2020) (recognizing that "[a]n inmate experiencing an adverse action shortly after a correctional officer learns that the prisoner engaged in a protected activity may create an inference of causation").

Accordingly, Plaintiff has established colorable first-amendment retaliation claims regarding changing the type of his pants, removing his access to the computer, and limiting his access to the word processor. See Martin, 977 F.3d at 299; see also, e.g., Spiegla v. Hull, 371 F.3d 928, 943 (7th Cir. 2004) (applying Mt. Healthy, explaining that "a plaintiff may establish . . . a causal link between protected expression and adverse action through

68

evidence that the [adverse action] took place on the heels of protected activity," and finding plaintiff established that protected activity constituted motivating factor for adverse action where adverse action – a transfer and schedule change – came quickly after protected conduct, following lengthy period of previous posting and schedule, and defendant admitted anger at plaintiff's protected conduct (brackets and ellipsis in original) (internal quotation marks omitted)), disapproved on other grounds in later appeal, 481 F.3d 961 (7th Cir. 2007). Thus, Defendants' arguments regarding Plaintiff's retaliation claims lack merit. (See Docket Entry 85 at 3-7.)

Moreover, although they do not directly address this issue (see generally Docket Entry 85), Defendants have not conclusively established that they would have acted in the same manner absent Plaintiff's protected conduct. In this regard, Roach maintains that Plaintiff's clothing upon arrival differed from that of other inmates, creating "a concern on the part of facility management due to the potential for security issues amongst the offender population when one particular offender appears to wear unique clothing" (Docket Entry 85-2, ¶ 8). (See id., ¶ 7.) "Due to Plaintiff's special needs," Roach asserts, he "consulted with a local cloth/material store" (id., ¶ 9) and then arranged for the NC DPS facility which manufactures inmate uniforms (see id., ¶ 10) to make "Plaintiff several pants exactly like the rest of the inmates

69

wear" (id., ¶ 11). Defendants further maintained that these pants lacked pockets due to security concerns. (See, e.g., id., ¶ 14; Docket Entry 26, ¶¶ 97-98.) However, Plaintiff's evidence reflects that, inter alia, (1) after Plaintiff's transfer to Dan River, another high-ranking NC DPS official purchased additional pairs of Plaintiff's original pants for him; (2) Roach did not order material for Plaintiff's new pants for nearly six months after his arrival; (3) Roach ordered this material approximately three weeks after he received the State Superior Court orders, which made him visibly angry; (4) Plaintiff never experienced trouble with other inmates regarding his different clothing, including in the year between his arrival at Dan River and the confiscation of his disability-accommodating pants; and (5), despite Defendants' assertions regarding the security threat pants pockets posed, Roach ordered the conversion of worn pants with such pockets into shorts and their reissuance to Dan River inmates.

In addition, Roach suggests that he permitted Plaintiff to use the computer only while the word processor underwent repairs; that he provided Plaintiff 21 hours of access to the word processor in a secluded area; and that he "and [his] staff simply held [them]selves as well as Plaintiff to the terms of the prior settlement" (Docket Entry 85-2, ¶ 19). (See id., ¶¶ 15-17, 20.) Yet Plaintiff's evidence reflects that, inter alia, (1) upon Plaintiff's arrival at Dan River, the Warden arranged for Plaintiff

70

to utilize a computer for 20 hours a week in the Chaplain's Office, continuing the modification agreed to during Plaintiff's incarceration at Warren C.I.; (2) one day after Defendants received the State Superior Court orders, they removed Plaintiff's access to the computer; (3) three days after receiving those orders, Roach directed that Plaintiff receive access only to the word processor, in a high-traffic area, under a schedule that, at best, afforded him 14 hours of access each week; and (4), in implementing these changes, Defendants displayed visible anger regarding the State Superior Court orders.

"Viewing these conflicting accounts in the light most favorable to [Plaintiff], there is a genuine dispute of material fact regarding whether [Defendants] would have [changed Plaintiff's pants, removed his access to a computer, and restricted his access to a word processor] absent a retaliatory motive. Because a reasonable juror could find that [Defendants acted] for impermissible reasons, summary judgment [i]s improper." Martin, 977 F.3d at 305. The Court should therefore deny Defendants' request for summary judgment on Plaintiff's retaliation claims.

## CONCLUSION

Material factual disputes exist regarding Defendants' retaliation towards Plaintiff and failure to provide necessary accommodations under the ADA and Rehabilitation Act.

71

**IT IS THEREFORE RECOMMENDED** that the Motions (Docket Entries 61, 84) be denied.

This 26th day of August, 2021.

           /s/ L. Patrick Auld
           **L. Patrick Auld**
           **United States Magistrate Judge**